**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AVIS NASH | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 09-342-RGA-MPT |
| | : | |
| MICHAEL J. ASTRUE | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

**Introduction**

Plaintiff, Avis Nash ("plaintiff") appeals from a decision of Michael J. Astrue, the

Commissioner of Social Security ("defendant"), denying her claim for ongoing Social

Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act

("Act").[1] Currently before the court are the parties' cross-motions for summary

judgment.

**Jurisdiction**

A district court has the jurisdiction to review an administrative law judge's ("ALJ")

decision in a Title II DIB case once it becomes the final decision of the Commissioner.[2]

A decision of the Commissioner becomes final when the Appeals Council either affirms

---

[1] *See* 42 U.S.C. §§ 401-433
[2] 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States for the judicial district in which the plaintiff resides.").

or denies review of an ALJ decision, or when a claimant fails to appeal the ALJ's decision within 60 days of unfavorable ruling.[3]

Here, the ALJ's decision is the final decision of the Commissioner because the Appeals Council denied plaintiff's request for appeal. Therefore, this court has jurisdiction to review the ALJ's decision.

**Procedural Background**

Plaintiff applied for DIB on January 31, 2004, asserting a disability onset date of March 18, 2002 due to a back injury. Plaintiff's claim was initially denied by the Social Security Administration, and again denied upon reconsideration. Plaintiff then requested a hearing before an ALJ.

The ALJ held a video hearing on February 13, 2006 and plaintiff, represented by counsel, testified and amended her disability onset date to December 17, 2002. Additionally, a Vocational Expert ("VE"), Jan Howard Reed, testified. The ALJ allowed the record to remain open for two weeks for the submission of a witness statement and a closing statement.

On February 28, 2006, the ALJ directed plaintiff undergo a consultative exam with Dr. Yong Kim at Disability Determination Services ("DDS"), which occurred on May 9, 2006. Plaintiff requested a supplemental hearing, which was denied by the ALJ, who in turn directed interrogatories be submitted.

On October 14, 2006, the ALJ returned a partially favorable decision for plaintiff finding she was disabled from December 17, 2002 until January 1, 2006. However, the

---

[3] *See* 20 C.F.R. § 416.1455; *see also* 20 C.F.R. § 404.905.

ALJ determined medical improvement occurred as of January 2, 2006 and denied ongoing DIB.

The ALJ's decision became final when the Appeals Council denied plaintiff's request for review on February 13, 2009.

**Background**

Plaintiff was 39 years old at the time of the partially favorable ALJ decision. She has a twelfth grade education, and is able to read, write, and perform simple math problems. Her past relevant work consists of working as a bus and van driver.

**Medical Evidence[4]**

Plaintiff was insured for disability benefits through December 31, 2005.[5] On March 18, 2002, she was injured while employed as a paratransit driver, when she was assisting an obese patient. Later that same day, plaintiff received emergency treatment from Christiana Care Hospital for low back pain. She was diagnosed with a lumbar strain, prescribed medications, and discharged from the hospital.

On March 19, 2002, plaintiff visited her primary care physician Dr. Burdick, who refilled her pain prescriptions and referred her to Dr. Sternberg of Delaware Back Pain and Sports Rehabilitation Center.

Dr. Sternberg's initial evaluation occurred on April 8, 2002. He noted plaintiff's inward flexion was limited to twenty degrees, had marked tenderness in her spine, with positive bilateral straight leg testing; however, his detailed muscle testing of the lower

---

[4] All facts and medical information referenced herein are found in D.I. 7
[5] Plaintiff must establish disability started on or before the date DIB insurance expired. *See* 42 U.S.C. § 405(g).

3

extremities showed strength of 5 out of 5. Dr. Sternberg recorded plaintiff received some relief from the medications and prescribed additional measures, heat, ultrasound and physical therapy. Plaintiff attended physical therapy from 2002 to 2003. Lastly, Dr. Sternberg placed plaintiff off work for the following two weeks.

An MRI on June 1, 2002 revealed plaintiff had degenerative disc disease at L4-L5 with anterior spondylosis and small posterior disc bulge associated with mild spinal stenosis. Plaintiff was continued on the pain medications and physical therapy and was released to light duty work on June 17, 2002.

Plaintiff was either unable to find suitable work, or unable to work due to her back pain and was returned to off work on December 12, 2002. Plaintiff's November exam showed flexion within normal limits and no pain during straight leg raising, however, there was tenderness in the spine. Previously, plaintiff received epidural steroid block injections from Dr. Devotta of Glasgow Medical Center, at the recommendation of Dr. Sternberg, on October 28, 2002 and November 25, 2002. On December 12, 2002, plaintiff was referred to Dr. Katz of First State Orthopedics for a surgical consultation.

Plaintiff initially consulted Dr. Katz on December 17, 2002. Dr. Katz diagnosed an internal disk derangement and recommended a diagnostic test. This procedure was performed by Dr. Falco on February 6, 2003, which revealed back pain of 10 out of 10 at L4-L5 and back pain of 8 out of 10 at L5-S1. Dr. Falco's impression was degenerative disease at both L4-L5 and L5-S1 with concordant low back pain.

Plaintiff was again seen by Dr. Katz on March 18, 2003. Dr. Katz opined a lumbar fusion should be the last resort and recommended Intradiscal Electrothermal Therapy ("IDET"), continue her weight loss program and to use a back brace after the

IDET.

The IDET was performed by Dr. Katz on March 21, 2003.  Attempts to conduct the procedure at the L4-L5 disc space were wholly unsuccessful.  Administering the procedure at the L5-S1 disc space was initially successful, but was aborted after fifteen minutes due to increased leg pain.

Plaintiff noted slight improvement in her leg pain after the IDET, but still experienced severe low back pain which extended into her upper legs.  As a result, Dr. Katz performed a lumbar fusion on September 15, 2003.  Plaintiff saw Dr. Daniel Kim of the Mid-Atlantic Pain Institute on September 23, 2003, during which Dr. Kim noted plaintiff was recovering from surgery and placed her off work.

Plaintiff's pain showed improvement for six weeks following the lumbar fusion, but she then experienced increasing back pain.  A second surgery was performed on November 24, 2003 to replace the right pedicle screws.  X-rays confirmed good placement of the instrumentation.

In March 2004, plaintiff began aquatic therapy with Pro Physical Therapy and noted some improvement in her symptoms, although she continued to experience severe right leg pain.  On April 27, 2004, a CT scan was performed which showed good alignment with minimal left spondylosis at L5-S1.

Although the fusion was a surgical success, because of continued pain, Dr. Falco, on May 5, 2004, recommended plaintiff undergo implantation of a spinal cord stimulator to reduce her leg pain.  A trial spinal cord stimulator was inserted on June 25, 2004 with good results.  Thereafter, a permanent stimulator was surgically implanted on August 6, 2004 by Dr. Falco.  During a follow up exam, plaintiff reported a significant

decrease in leg pain from the spinal cord stimulator, noting a pain level of 3 out of 10, while without the stimulator, her pain level was of 7 out of 10. Plaintiff discontinued one of her prescribed pain medications (Topamax) due to the relief in leg pain from the stimulator.

On August 25, 2004, plaintiff reported a 60-70% reduction in her remaining pain from the pain medications. However, only a few weeks later, on September 8, 2004, she was experiencing only 30-40% pain relief from the medications and 30-40% pain relief from the stimulator. Her low back pain level was of 7 to 8 out of 10. The September 8 exam also revealed diffuse tenderness of the spine, normal muscle strength in arms and legs, and intact sensation, with normal ambulation, without an assistance device. Plaintiff was continued on pain medications.

During an office visit on September 22, 2004, plaintiff's pain ranged from 7 to 10 out of 10. Plaintiff complained pain interfered with her ability to function. She was advised to have a PSIS block performed, and underwent this procedure on October 25, 2004.

Plaintiff's files from Mid-Atlantic Pain Institute and Mid-Atlantic Spine indicate no improvement in the severity of her pain from September 22, 2004 to January 12, 2006. She saw doctors on a regular basis and consistently reported pain averaging from 7 to 8 out of 10, which interfered with her ability to function.

According to her medical records, implantation of a peripheral nerve stimulator device, similar to the spinal cord stimulator, was recommended on three occasions to reduce her low back pain. On each instance, plaintiff declined to have the procedure performed. On July 28, 2005, her pain medication dosage was increased.

Treatment notes from February 9, 2006 to September 28, 2006 show a consistent pain level of 8 out of 10. During this time, medications were changed or increased, and hydrotherapy was prescribed. The medical record indicates on July 6, 2006, plaintiff agreed to insertion of the peripheral nerve stimulator and was awaiting the procedure.

After the hearing before the ALJ on February 13, 2006, a consultation exam with Dr. Yong Kim occurred. He reviewed plaintiff's treatment records and conducted a twenty minute examination. He found plaintiff's walking, sitting and standing were limited to three to five hours in an eight hour work day, and lifting limited to ten to twenty pounds. Dr. Yong Kim's report was submitted on May 9, 2006.

Dr. Daniel Kim, one of plaintiff's treating physicians, submitted a rebuttal report. He opined the limits in Dr. Yong Kim's report were the maximum plaintiff could do, and would decrease as the day transpired. Dr. Daniel Kim determined plaintiff's walking and standing was limited to less than two hours a day, and sitting four hours per day, with occasional lifting limited to ten pounds. Furthermore, he restricted plaintiff from climbing, balancing, kneeling, crouching, crawling, or stooping activities and working with heavy machinery or heights because of pain exacerbation and the risk of further injury. In preparing his report of July 6, 2006, Dr. Daniel Kim relied on plaintiff's prior treatment history. While he did not conduct an in person examination of plaintiff, he last examined plaintiff as recently as April 6, 2006. However, evidence of Dr. Daniel Kim's examinations of plaintiff after January 1. 2006 was not presented before the ALJ.[6]

---

[6] This evidence was submitted to the Appeals Council.

After the ALJ's determination, plaintiff appealed to the Appeals Council, and submitted additional medical records from Mid-Atlantic Spine for the time period between February 9, 2006 through September 28, 2006. In these documents, plaintiff continued to report a pain level of 7-8 out of 10, and interference with her ability to function of 8-10 out of 10.

**Additional Relevant Evidence**

After the ALJ ordered plaintiff undergo a consultative examination with DDS, plaintiff filed a response on March 16, 2006,[7] that her treating physicians were "qualified, equipped and willing to perform" the examination and would be able to resolve any conflicts or inconsistencies in the record.[8] On May 24, 2006, after Dr. Yong Kim's consultative examination, plaintiff requested a supplemental hearing, but gave no reason for her request.[9] On May 25, 2006, the ALJ ordered plaintiff to submit interrogatories to the VE in lieu of a supplemental hearing, and allowed the record to remain open for ten days for the submission of the interrogatories.[10] On June 5, 2006, plaintiff submitted additional interrogatories directed to the VE, and added to the record her affidavit, the curriculum vitae of Dr. Falco, witnesses' statements and a post-hearing argument.[11] Plaintiff again requested a supplemental hearing, citing for her reasons, to provide live testimony from plaintiff concerning the consultative examination and to cross-examine the VE.[12]

---

[7] D.I. 15-1.
[8] *Id.*
[9] *Id.* at 15-2.
[10] *Id.* at 15-4.
[11] *Id.* at 15-3.
[12] *Id.*

**Residual Functional Capacity Assessments**

Dr. Borek, a DDS medical consultant, completed a Physical Residual Functional Capacity Assessment ("RFC") on May 3, 2004.[13]  Dr. Borek found plaintiff could occasionally lift ten pounds, and frequently lift less than five pounds, could stand and/or walk (with normal breaks) for at least two hours in an eight hour work day, sit (with normal breaks) for about six hours in an eight hour work day, and was unlimited in pushing and/or pulling except for the limitations already noted.  He found plaintiff has postural limitations and could occasionally climb stairs, but not ropes, ladders or scaffolding, and could occasionally balance, stoop, kneel, crouch and crawl.  The RFC also notes plaintiff should avoid concentrated exposure to extreme cold, vibration and hazards.  Dr. Borek concluded plaintiff suffered from a medically determinable impairment, but it was partially disproportionate to the expected severity or expected duration of symptoms.  He also opined the effect of the symptoms on plaintiff's ability to function was partially consistent with the total evidence.  Lastly, Dr. Borek determined plaintiff had a maximum RFC (including class III morbid obesity) for sedentary work.[14]

On September 2, 2005, Dr. Falco completed a Lumbar Spine Residual Functional Capacity Questionnaire ("FCQ").[15]  Dr. Falco listed plaintiff's prognosis as poor because pain interfered with her ability to concentrate and pay attention while her medication also affected concentration and caused mood changes and sleepiness.  Dr.

---

[13] *See* D.I. 7 at 322-30.
[14] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carry out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. 404.1567(a).
[15] *See* D.I. 7 at 538-42.

Falco concluded plaintiff could sit and stand for only twenty minutes at one time, sit, stand or walk for about two hours in an eight hour work day, must walk every thirty minutes, for five to ten minutes.  Dr. Falco reported plaintiff could occasionally lift ten pounds, should never stoop, bend, crouch, squat or climb ladders, should rarely twist and can occasionally climb stairs.  Lastly, Dr. Falco opined plaintiff is totally disabled and unable to work.

On May 11, 2004, plaintiff underwent a Mental Residual Functional Capacity Assessment.[16]  The consultant found plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions, and perform at a consistent pace without an unreasonable number and length of rest periods.  In the other areas of the assessment, she was not significantly limited.  Lastly, the consultant commented plaintiff's pain may be distracting and her medications may be sedating.

**The Administrative Law Hearing**

**Plaintiff's Testimony**[17]

During her testimony before the ALJ via the video hearing on February 13, 2006, plaintiff amended the onset date of disability to December 17, 2002.  Plaintiff testified she completed high school and can read, write and do simple math.  Her previous employment consisted of working as a bus and van driver.  Plaintiff claimed she can no longer perform this work due to an on the job back injury, incurred while trying to assist

---

[16] *See* D.I. 7 at 333-35.
[17] All information reference herein is found in D.I. 7 at 795-820.

an obese patient, and stopped working on the advice of her doctor.

Plaintiff testified she has undergone several surgeries for her back, including implantation of a spinal cord stimulator in 2004. Plaintiff stated her pain level has either remained the same or worsened since the procedures. She described the pain level as 7.5 out of 10, despite surgeries and therapy, and starts at her belt line and radiates into her legs.

Plaintiff testified her pain medications include Morphine 100mgs, Oxycodone 30mgs and Methocarbamol 750mgs, which was recently increased. She asserted the medications had side effects including weight gain, sleepiness, mood swings, poor concentration, grogginess and forgetfulness. Her weight has caused additional problems, affecting use of the bathroom, sleeping and breathing.

Concerning her functional limitations, plaintiff stated she must rest after walking for eight minutes, can only stand for ten minutes at a time, can only sit for twenty to thirty minutes at a time, and had great difficulty bending, kneeling and stooping. Plaintiff also claimed she had difficulty lifting a gallon of milk, and climbing stairs, which is a long and painful process. She stated a port-a-potty was installed on the first floor of her residence to minimize use of the stairs.

Regarding her daily activities, plaintiff stated she only sleeps a maximum of four hours per night due to pain and spasms in her back and legs, despite the medications prescribed. She needs assistance getting out of bed, going to the bathroom, showering, getting in and out of the bathtub, brushing her teeth and hair, as well as with other personal hygiene, and getting dressed, including putting on her shoes. Plaintiff stated her family does most of the cooking, although she can use the microwave and make a

sandwich.  According to plaintiff, her family also handles household chores, including the grocery shopping.  Plaintiff can drive for simple errands, including to the location for the hearing.  Finally, plaintiff testified she does not have any hobbies, does not use a computer, and is unable to socialize, but attends church on occasion.

### Vocational Expert[18]

According to the VE, plaintiff's past employment was a semi-skilled position.  Her prior jobs skills would be transferable to light driving and/or dispatching positions.  During the VE's testimony, the ALJ posited the following hypothetical individual:  a thirty-four year old person, with a high school education, work history as a semi-skilled driver, several underlying impairments limiting work at a sedentary level of exertion, with occasional postural changes except never climbing a ladder, rope or scaffolding or crawling, avoiding all exposure to hazards due to medication, moderate exposure to extreme cold, and concentrated exposure to extreme heat, limited to simple, unskilled work, but not at production pace.  Given this hypothetical person, the ALJ asked whether any work in the regional or national economy existed that such a person could perform.  The VE answered affirmatively and provided examples of three jobs:  a sedentary security guard with 300 jobs locally[19] and 70,000 jobs nationally; an assembler with 1,000 jobs locally and 85,000 jobs nationally; and an inspector with 500 jobs locally and 70,000 jobs nationally.  The VE further stated these positions could accommodate a person who needed to sit and stand often, and did not require a production pace.

---

[18] See D.I. 7 at 821-26.
[19] Locally was defined by the VE as within 70 miles from New Castle, DE.

Plaintiff's attorney posited another hypothetical person to the VE, based on the RFC Questionnaire[20] of Dr. Falco. Accordingly, the hypothetical person suffered from pain severe enough to interfere with attention and concentration (34% to 66% of an eight hour work day), was limited to sitting for two hours, standing and walking for two hours, with needing to walk during an eight hour work day every thirty minutes, which lasted between five and ten minutes, and will be absent more than four days per month. Based on these facts, the VE testified such a hypothetical person would be unable to do any of the aforementioned jobs.

**ALJ's Decision**[21]

In her detailed decision regarding plaintiff's claim for DIB on October 14, 2006, the ALJ concluded as follows:

1.  The claimant met the insured status requirements of the Social Security Act as of December 17, 2002, the date the claimant became disabled.
2.  The claimant has not engaged in substantial gainful activity since December 17, 2002, the alleged onset date.
3.  At all times relevant to this decision, the claimant has had the following severe impairments: lumbar degenerative disc disease and obesity (20 CFR 404.1520(c)).
4.  From December 17, 2002 through January 1, 2006, the period during which the claimant was disabled, the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d)).
5.  After careful consideration of the entire record, the undersigned finds that, from December 17, 2002 through January 1, 2006, the claimant did not have the residual functional capacity to perform even sedentary exertional work on a regular and sustained basis.
6.  From December 17, 2002 through January 1, 2006, the claimant

---

[20] *See* D.I. 7 at 538-42.
[21] All information referenced herein is found in D.I. 7 at 17-30.

was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on May 18, 1967 and was 35 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity assessed for the period from December 17, 2002 through January 1, 2006 (20 CFR 404.1568).

10. From December 17, 2002 through January 1, 2006, considering the claimant's age, education, work experience and residual functional capacity, there were no jobs that existed in significant umbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was under a disability, as defined by the Social Security Act, from December 17, 2002 through January 1, 2006 (20 CFR 404.1520(g)).

12. Medical improvement occurred as of January 2, 2006, the date the claimant's disability ended (20 CFR 404.1594(b)(1)).

13. Beginning on January 2, 2006, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1594(f)(2)).

14. After careful consideration of the entire record, the undersigned finds that, beginning on January 2, 2006, the claimant has had the residual functional capacity to perform sedentary exertional work, with occasional postural activities, no crawling or climbing ladders, ropes, scaffolding, avoiding concentrated exposure to extreme heat, wetness, humidity, and avoiding even moderate exposure to extreme cold, avoiding all exposure to hazards, and limited to simple unskilled work not at a production pace.

15. The medical improvement that has occurred is related to the ability to work (20 CFR 404.1594(b)(4)(I)).

16. Beginning on January 2, 2006, the claimant has been unable to perform past relevant work (20 CFR 404.1565).

17. Beginning on January 2, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404,

Subpart P, Appendix 2).

18. Beginning on January 2, 2006, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy.

19. The claimant's disability ended on January 2, 2006 (20 CFR 404.1594(f)(8)).

## Parties' Contentions

### Plaintiff's Contentions

Plaintiff asserts the ALJ violated the Hearing, Appeals and Litigation law Manual[22] ("HALLEX"), provision I-2-5-44[23] and her due process rights by failing to hold a supplemental hearing as requested by plaintiff. She argues even though HALLEX is not considered a formal law, it still warrants consideration. Plaintiff maintains an ALJ must grant a supplemental hearing unless the additional evidence supports a favorable decision for the claimant. Furthermore, plaintiff argues a supplemental hearing, with the opportunity to provide additional live testimony regarding the consultation exam and cross-examine the physician who conduct the exam, were required for a full and true disclosure the facts and a full presentation of the case. Plaintiff contends live cross-examination of the consulting physician could reveal what evidence was relied upon, or not considered, how firm the physician's opinion is, and if there were any qualifications to his conclusions. Additionally, plaintiff asserts a supplemental hearing was required due to the eight month delay between the time of the hearing and the ALJ's decision.

Plaintiff further notes the ALJ improperly applied the medical improvement

---

[22] "HALLEX defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council and action level." (http://www.ssa.gov/OP_Home/hallex/I-01/I-1-0-1.html)

[23] http://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-44.html

standard prior to summarily conclude there has been medical improvement. Plaintiff claims the ALJ improperly relied on, as part of her decision to deny ongoing DIB, the lack of medical evidence after January 1, 2006. Plaintiff posits there was no medical evidence after that date because the ALJ hearing was held on February 13, 2006, and the record was closed at that time. Plaintiff points out she supplied additional medical records to the Appeals Council for the time period after January 1, 2006, and this additional evidence supports her claim for on going disability by showing continued severe pain, no positive improvement in her symptoms, a negative change in her symptoms, and no significant improvement in her ability to function. Plaintiff claims her condition never stabilized which required increased pain medication. Furthermore, plaintiff argues her testimony did not show any medical improvement. Therefore, plaintiff asserts the ALJ's decision finding medical improvement was not supported by substantial evidence.

Finally, plaintiff contends the ALJ failed to obtain a supplemental report from plaintiff's treating physician who was qualified, equipped and willing to perform the additional examination or tests for the fee schedule payment. Additionally, plaintiff maintains the treating source is the preferred source, and the consultative exam was unnecessary. If additional information is needed or to resolve a conflict in the record, her treating physician was available to assist.

**Defendant's Contentions**

Defendant argues the ALJ's decision that plaintiff could perform sedentary occupations, as identified by the VE, after January 1, 2006 was fully supported by substantial evidence. Defendant points to plaintiff's report of significant relief in her leg

16

pain and positive results from her pain medication. Defendant further claims the ALJ properly afforded greater weight to the consultation exam, rather than plaintiff's rebuttal report, even though it came from a treating source, because the consultant, in addition to reviewing plaintiff's medical history, conducted a in-person exam, while the rebuttal physician only relied on past medical history. Furthermore, the rebuttal physician did not point to any current evidence suggesting sedentary work was not appropriate. Additionally, defendant notes plaintiff was evaluated by state agency physicians who believed she was capable of sedentary work. Defendant further contends this court should not rely on any additional evidence presented by plaintiff, since its review should not be based on evidence not presented before the ALJ.

Defendant next argues the ALJ's denial of plaintiff's request for a supplemental hearing did not violate either HALLEX, or plaintiff's due process rights. Defendant maintains HALLEX does not create any judicially enforceable rights. Even where HALLEX is found to be a guiding factor, it only provides a claimant be given an opportunity to examine the evidence prior to its admission into the record. Regarding due process, defendant argues the ALJ provided plaintiff with the essential requirements, that is, the right to confront and challenge evidence in a meaningful way, by allowing plaintiff to examine the consultation report, challenge the report through a rebuttal statement and serve interrogatories. Defendant asserts no showing has been made that a supplemental hearing was necessary, and plaintiff was required to do something more than just request a supplemental hearing. Defendant posits plaintiff needed to show the appearance of the consultant, and subsequent cross-examination were reasonably necessary for the full presentation of the case.

Finally, defendant maintains the ALJ was not required to select one of plaintiff's treating physicians to perform the consultative exam, since the decision on which consultant to use is within the ALJ's discretion. Furthermore, there is no indication the physician plaintiff wanted was currently treating her, and a medical source needs to be re-contacted only when the evidence is inadequate to determine whether the claimant is disabled, which was not the present situation.

**Standard of Review**

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In determining the appropriateness of summary judgment, the court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."[24] If the court is able to determine "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[25]

This court's review is limited to determining whether the final decision of the Commissioner is supported by substantial evidence.

> Substantial evidence is less than preponderance but more than a mere scintilla. It is such relevant evidence as a reasonable mind would accept as adequate support for a conclusion. It must do more than create a suspicion of the existence of a fact to be established . . . it must be enough to justify, it the trial were put to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact to the jury.[26]

---

[24] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted).

[25] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (internal quotation marks omitted).

[26] *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).

The Supreme Court has embraced a similar standard for determining summary judgment pursuant to Fed. R. Civ. P. 56:

> The inquiry performed is the threshold inquiry of determining whether there is a need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. . . . [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of evidence, however, a verdict should not be directed.[27]
>
> Overall, this test is deferential, and we grant similar deference to agency inferences from facts if those inferences are supported by substantial evidence, "even [where] this court acting *de novo* might have reached a different conclusion."
>
> Furthermore, evidence taken as a whole must be sufficient to support a conclusion by a reasonable person, not just the evidence consistent with the agency's decision.
>
> Thus, a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is the evidence substantial if it is overwhelmed by other evidence - particularly certain types of evidence (e.g. that offered by treating physicians) - or if it really constitutes no evidence but a mere conclusion.[28]

Where, for example, countervailing evidence consists primarily of the claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record."[29]

Cross-motions for summary judgment are "no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is

---

[27] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) (citation omitted).
[28] *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).
[29] *Matullo v. Brown*, 926 F.2d 240, 245 (3d Cir. 1990).

necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."[30]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[31]

**Disability Determination Standard**

### Five-Step Test to Determine Disability

The Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled.[32]

In step one the ALJ must determine if the claimant is engaged in any substantial gainful activity. If a claimant is found to be engaged in any substantial gainful activity, the ALJ will find the claimant not disabled.[33]

In step two, the ALJ must determine if the claimant is suffering from a medically determinable impairment that is severe and meets the durational requirement. A severe impairment is one that significantly limits a claimant's ability to do basic work activities.[34] If the claimant does have a severe impairment, the analysis proceeds to the next step.

In step three, the ALJ determines if a claimant's impairments meets or medically equals the criteria of one of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.[35] If the claimant's impairments meet or equal a listed impairment, the claimant is disabled. If not, the analysis proceeds to the next step.

Before continuing to step four, if claimant's impairments do not meet or equal a listed impairment, the ALJ will assess the claimant's residual functional capacity, to be used in steps four and five.[36]

In step four, the ALJ compares the claimants residual functional capacity to her past relevant work. If a claimant can still perform past relevant work, then she is not disabled.[37] If a claimant cannot perform past relevant work, the analysis proceeds to the last step.

---

[30] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).
[31] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).
[32] 20 C.F.R. § 404.1520(a).
[33] *Id.* at § 404.1520(b).
[34] *Id.* at § 404.1520(c).
[35] *Id.* at § 404.1520(d).
[36] *Id.* at § 404.1520(e).
[37] *Id.* at § 404.1520(f).

In step five, the ALJ must consider the claimant's impairments, residual functional capacity, age, education, and work experience to determine if the claimant can perform other work. Here the burden shifts to the ALJ to show that there are other jobs existing in significant numbers in the national economy which the claimant can perform. The ALJ will often seek the assistance of a vocational expert at this fifth step.[38]

If the ALJ determines a claimant is disabled at any step in the sequence, the analysis stops.[39]

### Application of the Five-Step Test

Neither party contests the ALJ's finding of disability from December 17, 2002 until January 1, 2006. Since there are no allegations that the ALJ misapplied any one of the five steps in reaching that decision, the court need not address that finding.

### Eight Step Test to Determine Continuing Disability

If disability is found, the Social Security Administration has developed an eight step test to determine if a claimant's disability will continue.[40] These steps echo portions of the above five-step test, but have significant differences.

In step one, the ALJ will determine if the claimant is currently engaged in any substantial gainful activity. If no substantial gainful activity is found, the analysis will proceed to the next step.[41]

In step two, the ALJ will determine if the claimant has an impairment that meets or equals the severity of an impairment listed in Appendix 1.[42]

In step three, the ALJ will determine if there has been any medical improvement as shown by a decrease in medical severity. If there has been no decrease in severity, there has been no medical improvement.[43]

If the ALJ finds that there has been medical improvement, step four requires the ALJ to determine if the medical improvement relates to the

---

[38] *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).
[39] *See* 20 C.F.R. § 404.1520(a).
[40] *Id.* at § 404.1594(f).
[41] *Id.* at § 404.1594(f)(1).
[42] *Id.* at § 404.1594(f)(2).
[43] *Id.* at § 404.1594(f)(3).

claimant's ability to work.  The question is whether or not there has been an increase in the residual functional capacity of the claimant based on the impairments that were present at the time of the most recent favorable medical determination.[44]

In step five, the ALJ must determine if an exception to medical improvement applies.  If no medical improvement was found in step three, or if the medial improvement was found not to relate to the claimant's ability to do work, and no exception applies, then the disability continues.[45] There are two groups of exceptions.[46]  If an exception from the first group applies, then the analysis continues.  If an exception from the second group applies, then the disability has ended.

In step six, the ALJ will determine if the claimant's impairments are severe, looking at all impairments, in combination, and their impact on the claimant's ability to function.  If there is significant limitation on the claimant's ability to do basic work, the analysis continues.[47]

In step seven, the ALJ will assess the claimant's residual functional capacity, based on current impairments, and determine if past relevant work can be performed.[48]  If the claimant is found to be capable of doing past relevant work, the disability has ended.

Lastly, in step eight, the ALJ must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, there is work available in significant numbers in the national economy that the claimant can perform.[49]

The two steps contested in the instant matter are steps three, medical improvement, and eight, work existing in the national economy which plaintiff could perform.  These steps will be addressed herein.

**Discussion**

### Evidence Not Submitted to the ALJ

The court's review is limited to the evidence actually presented to the ALJ.[50]

Evidence not submitted to the ALJ can be considered by the district court as a basis for

---

[44] *Id.* at § 404.1594(f)(4).
[45] *Id.* at § 404.1594(f)(5).
[46] *Id.* at § 404.1594(d), (e).
[47] *Id.* at § 404.1594(f)(6).
[48] *Id.* at § 404.1594(f)(7).
[49] *Id.* at § 404.1594(f)(8).
[50] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).

remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g).[51]  However, such evidence must be new and material and there must be a good cause for failing to submit it to the ALJ.[52]

The additional evidence submitted to the Appeals Council[53] by plaintiff will not be considered by the court in its review.  A reviewing court may rely on evidence not submitted to the ALJ in determining if the matter should be remanded, but the additional evidence must meet three criteria noted herein.  While the evidence in question is certainly material to the case, as it contains medical records for patient visits extending beyond the time of the hearing, and it may be considered new, the question is whether plaintiff had good cause for failing to submit it to the ALJ.

Plaintiff argues the reason why this evidence was not submitted to the ALJ was because the record actually closed on February 13, 2006, the day of the hearing. Although when the record closed is unclear, plaintiff's assertion that it closed on February 13 is clearly contrary to the evidence.

On February 13, 2006, the date on which plaintiff alleges the record closed, the ALJ stated the record would remain open for at least two more weeks to allow plaintiff to submit a written witness statement and a closing argument.  On February 28, 2006, the ALJ informed plaintiff a consultative examination with DDS had been scheduled. Plaintiff responded to the ALJ's notification on March 16, 2006.  The consultant's report was submitted on May 9, 2006.  On  May 25, 2006, the ALJ requested plaintiff to submit

---

[51] *Id.* at 592.
[52] *Id.* at 593; 42 U.S.C. § 405(g).
[53] *See* D.I. 7 at 741-792.

interrogatories to the VE, stating the record would close in ten days if plaintiff did not respond. Plaintiff submitted her interrogatories, along with a post hearing argument, witness statement and other documents to the ALJ on June 5, 2006. Thereafter, plaintiff submitted the rebuttal report of Dr. Daniel Kim on July 6, 2006.

Plaintiff's argument that the record closed on February 13, 2006 is not persuasive. There are multiple examples, mentioned above, indicating the record remained open long after the hearing date. It was not until plaintiff received a partially unfavorable decision, and took an appeal, that plaintiff submitted new evidence. Therefore, plaintiff has not shown good cause for failing to submit this evidence to the ALJ.

### Not Using a Treating Source for an ALJ Ordered Consultation

An ALJ may order a consultative examination if the claimant's medical source "cannot or will not give [the ALJ] sufficient medial evidence" to determine disability.[54] A consultative examination may be used when a source "is known to be nonproductive or uncooperative,"[55] claimant's "treating source prefers not to perform such an examination or does not have the equipment" necessary,[56] claimant's treating source is not a productive source or has "consistently failed to provide complete or timely reports,"[57] or "there are inconsistencies in [claimant's] file that cannot be resolved by going back to

---

[54] 20 C.F.R. § 404.1517; *see also* 20 C.F.R. § 404.1519a(a) ("If [the ALJ] cannot get the information [needed] from [claimant's] medical sources, [the ALJ] may decide to purchase a consultative examination.").

[55] 20 C.F.R. § 404.1512(e)(1) ("[I]n some instances, such as when a source is known to be unable to provide certain tests or procedures or is known to be nonproductive or uncooperative, we may order a consultative examination . . . .").

[56] *Id.* at § 404.1519i(a).

[57] *Id.* at § 404.1519i(d).

[claimant's] treating source."[58]

Furthermore, claimant's treating source will be the "preferred source to [perform] the additional examination" when, in the ALJ's judgement, the treating source is "qualified, equipped, and wiling to perform the additional examination or tests . . . and generally furnishes complete and timely reports,"[59] even if only a supplemental test is required.[60] Qualified is defined as being "currently licensed in the State and having the training and experience to perform the type of examination or test" requested, having "the equipment required to provide an adequate assessment and record of the existence and level of severity of [claimant's] alleged impairments," and "not be[ing] barred from participation."[61]

20 C.F.R. § 404.1519h makes clear a claimant's treating source is the preferred source for consultative examinations. While the ALJ has the discretion to refer an examination to a non-treating source, as defendant argues, the ALJ must provide some reason for choosing the non-treating source over a treating source who is qualified, equipped and willing to perform the consultative exam. Section 404.1519h does not address the ALJ's discretion in referring the consultative exam to a non-treating source, but rather the determination whether the treating sources are qualified, equipped and willing to perform. Plaintiff informed the ALJ her treating physician was willing and able to perform the examination.[62] Because § 404.1519h clearly indicates a preference for plaintiff's treating physician to perform the consultative exam, the ALJ should explain

---

[58] *Id.* at § 404.1519i(b).
[59] *Id.* at § 404.1519h.
[60] *Id.* at § 404.1519h.
[61] *Id.* at § 404.1519g(b).
[62] D.I. 15-1 at 2.

why she used a DDS physician.  Although the list is not exhaustive, the regulations provide some examples of reasons why the ALJ would need to order a consultative examination conducted by a non-treating source, such as inconsistencies in the treating physician's reports, a nonproductive or uncooperative treating physician, or one who consistently fails to provide timely reports, and an inexperienced or ill-equipped source, or one who is unwilling to perform the exam.  The ALJ in this case, however, failed to provide any reason at all.

The defense cites the Third Circuit case *Moody v. Barnhart*[63] for the proposition that the ALJ was not required to re-contact plaintiff's treating source because there was sufficient evidence in the record for the ALJ to make her decision.[64]  However, this argument is not persuasive for many reasons.  Three key facts distinguish *Moody* from the present matter.  First, in *Moody*, there was a contradiction among plaintiff's treating physicians.[65]  In contrast to the present case, the ALJ has cited no inconsistency or contradiction in the record that warranted use of a non-treating physician for the consultative examination.  Secondly, in *Moody*, the physician plaintiff objected to testified at the hearing before the ALJ.[66]  In the instant matter, plaintiff objected to using a non-treating physician at a post hearing consultative examination.  Finally, that the ALJ ordered a consultative examination evidences her concern that the record was lacking or insufficient to make a disability determination.  In contrast to *Moody*, where the non-treating physician testified at the hearing, the non-treating physician in the

---

[63] 114 Fed. Appx. 495 (3d Cir. 2004).
[64] D.I. 18 at 19.
[65] *Moody*, 114 Fed. Appx. at 501.
[66] *Id.* at 499.

present case performed a consultation and submitted his report after the hearing, strongly suggesting the ALJ felt the record was insufficient to render a determination on disability at the end of the hearing.  The ALJ should have either used one of plaintiff's treating physicians for the consultation, or expressed her reason for using a non-treating physician, prior to the consultation.

**Failure to Use Treating Physician as Consultant Does Not Warrant Remand**

The question becomes whether the ALJ's error warrants remand for an explanation or if it is akin to harmless error,[67] which does not require remand. Regulations generally provide a district court may affirm, modify, or reverse the ALJ's decision, *with or without remand*, based on the record before the ALJ.[68]  Although the Third Circuit has not addressed whether an ALJ's failure to use a treating physician for a consultation (or failure to provide an explanation for failing to do so) demands remand, the Fifth Circuit has in *Fink v. Barnhart*.[69]

*Fink* determined an ALJ's failure to use a treating physician for a consultative examination was harmless error where the plaintiffs were allowed to submit additional medical reports from their treating physicians, thus leaving their substantive rights unaffected.[70]  In so finding, the Fifth Circuit relied on previous decisions which held "[p]rocedural perfection in administrative proceedings is not required," and "[the] court

---

[67] Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence-or any other error by the court or a party - is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

[68] 42 U.S.C. § 405(g) (fourth sentence).

[69] 123 Fed. Appx. 146 (5th Cir. 2005).  The Fifth Circuit is the only jurisdiction found to have directly addressed the issue.

[70] *Id.* at 148.

will not vacate a judgment unless the substantial rights of a party have been affected."[71] Therefore, the Fifth Circuit has held remand is necessary only where the ALJ's error casts doubt into the "existence of substantial evidence to support" her decision.[72]

This court agrees with the Fifth Circuit's reasoning.  In the instant matter, plaintiff had ample opportunity to submit additional evidence to the ALJ, but failed to do so. However, plaintiff did obtain and submit, to the ALJ, a medical report from one of her treating physicians.  Therefore, because plaintiff supplemented the record with a report from one of her treating physicians, the procedural error committed by the ALJ, not using a treating physician for the consultative examination, is harmless and did not affect plaintiff's substantial rights.

### Supplemental hearing

### HALLEX[73]

HALLEX does not carry the force of law.[74]  Nor does HALLEX "create [any] judicially-enforceable rights."[75]  Although the Third Circuit opinion in *Bordes* is not precedential, it is the best guidance and only source cited that directly addresses whether HALLEX materials require judicial enforcement.[76]

Plaintiff cites *Washington State Dep't of Soc. and Healths Servs. v. Keffeler*[77] for

---

[71] *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (citing *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

[72] *Id.* at 335.

[73] Plaintiff cites to HALLEX I-2-5-44, (http://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-44.html), in her brief.

[74] *Bordes v. Comm'r of Soc. Sec.*, 235 Fed. Appx. 853, 859 (3d Cir. 2007).

[75] *Id.*

[76] Defendant also cites *Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 71, n.2 (3d Cir. 1996) (only references the SSA's Program Operations Manual System (POMS), *and Sykes v. Apfel*, 228 F.3d 259, 271, n.14 (3d Cir. 2000) (references Social Security Rulings (SSR)).

[77] 537 U.S. 371 (2003).

the proposition that HALLEX provisions are judicially enforceable. Plaintiff argues *Washington State* requires courts to apply HALLEX provisions.[78] Ignoring that the Supreme Court was examining POMS, not HALLEX, the relevant analysis of *Washington State* stands for a much narrower finding. Although the Court reasoned "while these administration interpretations are not products of formal rulemaking, they nevertheless warrant respect . . . ,"[79] as emphasized by plaintiff,[80] the Court continued, "in closing the door on any suggestion that the usual rules of statutory construction should get short shrift for the sake of reading 'other legal process' in abstract breadth."[81] Therefore, the Supreme Court did not hold administrative interpretations, like those found in HALLEX, should always be followed by a reviewing district court, as plaintiff suggests, but may be helpful when interpreting statutory terms.[82]

### Full Presentation of the Case

### Right to Cross-Examine

The United States Supreme Court has held a party is entitled to "conduct such cross-examination as may be required for a full and true disclosure of the facts."[83] Furthermore, "an opportunity for cross-examination is an element of fundamental fairness of the hearing to which a claimant is entitled under section [405(b)] of the Social

---

[78] D.I. 19 at 4; *Washington State*, 537 U.S. at 385.
[79] *Washington State*, 537 U.S. at 385.
[80] D.I. 19 at 4.
[81] *Washington State*, 537 U.S. at 385.
[82] Even if HALLEX required enforcement by the reviewing court, the provision plaintiff cites, I-2-5-44, addresses when an ALJ receives a medical expert's response to interrogatories. The present case does not involve interrogatory responses from a medical expert.
[83] *Richardson v. Perales*, 402 U.S. 389, 409 (1971) (internal quotations admitted).

Security Act."[84]  "[I]t is unmistakable under the statute that the Secretary may not rely on post-hearing reports without giving the claimant an opportunity to cross-examine the authors of such reports, *when* such cross-examination may be required for a full and true disclosure of the facts."[85]  Lastly, written comment alone may be an inadequate substitute for cross-examination.[86]

Plaintiff argues both her rights to a supplemental hearing and due process were violated.  Previously before the ALJ, plaintiff only cited two reasons for a supplemental hearing:  the opportunity to provide additional live testimony from plaintiff and to cross-examine the VE.[87]  Never raised before the ALJ, plaintiff now argues the purpose of the supplemental hearing was to cross-examine Dr. Yong Kim.[88]

Due process only requires notice and an opportunity to be heard.  Plaintiff was give adequate notice that the ALJ intended to make Dr. Yong Kim's consultation part of the record.  Furthermore, her opportunity to be heard and challenge Dr. Yong Kim's report was met when she submitted the report from Dr. Daniel Kim as direct rebuttal.  Therefore, plaintiff's due process claim fails.

Plaintiff's claim of violation of her right to a supplemental hearing on a statutory basis fails as well.  While plaintiff relies heavily on *Wallace*, the requirements set forth therein have been met.  Under *Wallace*, written comments alone are insufficient, and cross-examination is required when an ALJ, to render a decision, goes outside of the

---

[84] *Wallace v. Bowen*, 869 F.2d 187, 192 (3d Cir. 1989) (interpreting *Richardson* for the Third Circuit).
[85] *Id.* at 191-92 (emphasis added).
[86] *Id.* at 192.
[87] *See* D.I. 15-3.
[88] D.I. 15 at 13.

evidence proffered at the hearing. Here, plaintiff was allowed to submit additional interrogatories to the VE, file a post-hearing argument, and most importantly, provide a rebuttal report from one of her treating physicians. These actions go beyond mere written comment and satisfy the requirements of *Wallace*.

Moreover, the facts of the present case and *Wallace* are distinguishable. In *Wallace*, the plaintiff objected at the hearing level to the consultative physician's report.[89] In the instant matter, plaintiff raised no such objection,[90] and was able to challenge the consultative physician's findings through her own consultant's report.

### Use of Subpoena

Having found plaintiff did not have a right to a supplemental hearing, the court will briefly address the issue of the right to subpoena. Defendant argues plaintiff may request the issuance of "subpoenas for the appearance and testimony of witnesses" "when it is reasonably necessary for the full presentation of the case,"[91] and plaintiff's failure to request such a subpoena constitutes a waiver of that right and evidences why she is not entitled to a supplemental hearing. However, the regulation defendant cites, 20 C.F.R. 404.950(d), only applies to subpoena rights before the hearing,[92] and the Third Circuit held, in *Wallace*, that regulation 404.950(d) does not control subpoena rights after the hearing.[93] Additionally, the claimant must be adequately noticed about

---

[89] *Wallace*, 869 F.2d at 194.
[90] *See* D.I. 15-3 (objecting generally to the report because it conflicted with treating physician reports and because treating physicians were available to do the consultation).
[91] 20 C.F.R. § 404.950(d)(1).
[92] *Id.* at § 404.950(d)(2) ("Parties to a hearing who wish to subpoena documents or witnesses must file a written request . . . at least 5 days before the hearing date."); *Wallace*, 869 F.2d at 193.
[93] *Wallace*, 869 F.2d at 193.

the right to subpoena physicians concerning post-hearing reports.[94]  Furthermore,

"[w]aiver of the right to subpoena and cross-examine witnesses concerning post-hearing

evidence must be 'clearly expressed or strongly implied from the circumstances.'"[95] In

*Wallace,* the plaintiff received notice of three possible response options to post-hearing

reports, but the right to subpoena the authors was not among them.[96]  Additionally, the

plaintiff in *Wallace* objected to the inclusion of the reports stating he had not had the

"opportunity to confront" or "challenge" the reports.[97]  The court in *Wallace* held that

"[h]aving failed to advise claimant that there was also a right to subpoena the authors of

these reports at another hearing, [the defendant] cannot reasonably argue now that [the

plaintiff] waived that right by not doing so."[98]

Unlike in *Wallace*, plaintiff in the instant matter did have an opportunity to

confront and challenge Dr. Yong Kim's report through Dr. Daniel Kim's rebuttal.

Therefore, the ALJ properly concluded, as noted herein, a supplemental hearing was

not necessary, rendering plaintiff's right to a post-hearing subpoena immaterial.

### Weight Given to Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight."[99]  This is especially so when "their

opinions reflect expert judgment based on a continuing observation of the patient's

condition over a prolonged period of time."[100]  Moreover, it will be given controlling

---

[94] *Id.*
[95] *Id.* (citing *Lonzollo v. Weinberger*, 534 F.2d 712, 714 (7th Cir. 1976)).
[96] *Id.*
[97] *Id.* at 194.
[98] *Id.* at 193.
[99] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).
[100] *Id.* (citing *Plummer*, 186 F.3d at 429).

weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence on the record.[101]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[102] If the ALJ rejects the treating physician's assessment, she may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[103] The ALJ "may choose whom to credit, but cannot reject evidence for no reason or for the wrong reason."[104] When the ALJ does not give the treating physician's opinion controlling weight, she must look at other factors in deciding how much weight to give it, including length of the treatment relationship, frequency of examinations, nature and extent of the treatment relationship, supportability, consistency and specialization.[105]

However, a statement by a treating source that a claimant is "disabled" is not a medical opinion: rather, it is an opinion on an issue reserved to the ALJ because it is an administrative finding that is dispositive of the case.[106] Therefore, only the ALJ can make a disability determination.

In the present matter, the ALJ did not give controlling weight to plaintiff's treating physician, Dr. Daniel Kim. For her reasoning, she cited lack of any significant treatment

---

[101] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[102] *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).
[103] *Plummer*, 186 F.3d at 429.
[104] *Id.* (citation omitted).
[105] *Sanchez v. Barnhart*, 388 F. Supp. 2d 405, 411-12 (D. Del. 2005); 20 C.F.R. § 404.1527(c)(2)-(6).
[106] *See* 20 C.F.R. § 416.927(e)(1).

in 2005; he provided no supporting treatment records or findings since January 1, 2006; he had not examined plaintiff since 2004; and plaintiff had repeatedly refused a nerve stimulator, similar to the stimulator used for her leg pain. The same reasons were cited by the ALJ in giving Dr. Daniel Kim's post-hearing report less weight than the report of the consultant, Dr. Yong Kim.

The ALJ properly gave less weight to Dr. Daniel Kim's report and more weight to Dr. Yong Kim's report. Based on the evidence before her, the ALJ determined Dr. Yong Kim was the only physician to recently examine plaintiff.[107] Dr. Daniel Kim had examined plaintiff only four times, with the most recent evaluation being an x-ray examination on February 2, 2004, over two years prior to the filing of his report in July 2006.[108] Of those four examinations, only one involved examining plaintiff's physical condition.[109] Regarding his other contacts with plaintiff, one was for an x-ray, another when plaintiff was recovering from back surgery, and the last simply states plaintiff is disabled, but provides no bases or findings for this conclusion. These four limited visits do now show a lengthy, consistent treatment relationship mandating his report as a treating physician be given great weight. Furthermore, Dr. Daniel Kim provided no evidence in his rebuttal report to support his conclusions. He does not mention any specific examinations he personally performed, nor does he mention what, if any, reports from plaintiff's other treating physicians he considered.

Dr. Yong Kim, on the other hand, performed a physical examination of plaintiff.

---

[107] D.I. 7 at 27-29.
[108] Plaintiff was examined by Dr. Daniel Kim on August 27, 2003 (D.I. 7 at 454, 709), September 23, 2003 (D.I. 7 at 310), October 22, 2003 (D.I. 7 at 445), and on February 9, 2004 (D.I. 7 at 369, 431, 432, 508).
[109] D.I. 7 at 445 ("[plaintiff] has no upper or lower extremity weakness").

As an examining physician, his report is given more weight than if he had only reviewed plaintiff's medical history. Dr. Yong Kim's report was specific and provided evidence for his conclusions, unlike Dr. Daniel Kim's mere conclusory report. Therefore, in the absence of any significant treatment history, physical examination of plaintiff and evidentiary support for his conclusions, the ALJ properly accorded Dr. Daniel Kim's report less weight than the report of Dr. Yong Kim.

**Medical Improvement**

The relevant question in determining medical improvement is whether there "has been any medical improvement in [claimant's] impairments and, if so, whether this medical improvement is related to [claimant's] ability to work."[110] Medical improvement is defined as "any decrease in the medical severity of [claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [claimant was] disabled or continued to be disabled."[111] "A determination that there has been a decrease in medical severity must be based on changes (improvements) in the symptoms, signs and/or laboratory findings associated with your impairment(s)."[112]

Plaintiff asserts the ALJ improperly found medical improvement. However, the court finds the ALJ's determination of medical improvement is supported by substantial evidence. The record fails to show plaintiff undergoing any significant treatment in 2005. While plaintiff continued to see her treating physicians, the treatment was generally conservative with an occasional modification to her medications. During this time, plaintiff refused a peripheral nerve stimulator implant to reduce her low back pain.

---

[110] 20 C.F.R. § 404.1594(a).
[111] *Id.* at § 404.1594(b)(1).
[112] *Id.*

This stimulator is similar to the one successfully implanted to reduce her leg pain in 2004.  Absence of any explanation from plaintiff for refusing implantation, and based on the absence of any recent evidence regarding treatment, as well as the limited treatment between 2004 to 2006, led the ALJ, and this court, to conclude her back pain was not as severe as claimed, or was under control with the aid of prescriptions.

As discussed herein, the ALJ properly applied greater weight to Dr. Yong Kim's May 9, 2006 report.  His report noted plaintiff's range of motion ("ROM") in all extremities was within normal limits ("WNL") with no joint swelling or edema; her cervical spine ROM was WNL with moderate to severe tenderness in the lumbosacral junction; plaintiff could ambulate on heels and toes and her gait was slow, but WNL. Straight leg test elicited pain at forty-five degrees on the right and at seventy-five on the left.  Plaintiff's strength was WNL except for some decreased grip strength.  Dr. Yong Kim concluded plaintiff would be limited to walking, standing, and sitting for three to five hours during an eight hour day, due to chronic low back pain radiating to her lower extremities.  He also found plaintiff could climb stairs and ladders occasionally, as well as balance, kneel, crouch, crawl and stoop occasionally.  Lastly, his report stated plaintiff could lift twenty pounds occasionally and ten pounds frequently.  The ALJ compared Dr. Yong Kim's findings with the findings from plaintiff's treating physician's September 2005 RFQ which found:  reduced ROM in all planes, walking, sitting and standing limited to two hours in an eight hour day, lifting limited to ten pounds, bending, crouching and climbing ladders should be prohibited with twisting performed rarely and climbing stairs occasionally.

Based on a review of the record, and the her reasoning, the ALJ's decision to

find medical improvement, allowing plaintiff to perform sedentary work, is supported by substantial evidence.

**VE Testimony**

Since the ALJ found plaintiff had medically improved, and was capable of sedentary work, the next issue for the ALJ to address was whether work existed in the national economy plaintiff could perform. To determine this issue, the ALJ relied on the testimony and expertise of Jan Reed, a VE. When positing questions to a VE, the "hypothetical question must reflect all of claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."[113]

Plaintiff makes a single conclusory statement in her demand for relief that the VE be asked a complete question, but she does not advance any argument that the hypothetical posed to the VE was inadequate. As stated herein, the ALJ posed a hypothetical person, with all of plaintiff's impairments and characteristics, to the VE and asked if there was any work existing in the regional and national economy for such a person. In fact, the hypothetical person posited to the VE had more limitations than what Dr. Yong Kim found during his examination, such as no production pace, no crawling or climbing of ladders and limited to jobs that could accommodate a sit/stand option. The VE, who had been present for the entirety of plaintiff's testimony, attested there were at least three jobs existing in the regional and national economy within plaintiff's impairments and restrictions. Therefore, the ALJ's decision that work existed,

---

[113] *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).

which plaintiff could perform, is supported by substantial evidence.

**ORDER**

Consistent with the findings contained in the Report and Recommendation of the

same date, IT IS RECOMMENDED that

(1) Defendant's cross-motion for summary judgment (D.I. 17) be GRANTED.

(2) Plaintiff's motion for summary judgment (D.I. 14) be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR

72.1 any objections to the Report and Recommendation shall be filed withing fourteen

(14) days limited to ten (10) pages after being served with the same.  Any response

shall be limited to ten (10) pages.

The parties are directed to the Court's standing order in Non-Pro Se matters for

Objections Filed under Fed. R .Civ. P. 72, (dated November 16, 2009), a copy of which

is available on the Court's website, www.ded.uscourts.gov.


Date: August 7, 2012                          /s/ Mary Pat Thynge
                                        UNITED STATES MAGISTRATE JUDGE